UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| KERRY WINN,<br><br>                 Plaintiff,<br><br>vs.<br><br>AMERITITLE, INC., an Oregon corporation,<br><br>                 Defendant. | Case No.1:10-cv-00016-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it cross motions for summary judgment and the defendant's motion to strike portions of one of the plaintiff's affidavits. The Court heard oral argument on July 21, 2010, and took the motion under advisement. For the reasons explained below, the Court will grant the defendant's motion for summary judgment and deny the plaintiff's motion for summary judgment. Given the Court's decision to grant defendant's motion for summary judgment, the defendant's motion to strike part of that affidavit is moot. The Court's analysis is set forth below.

## FACTUAL BACKGROUND

In early December 2005, Royce Monson entered into a vacant land real estate purchase and sale agreement (PSA) with Dee and Yoriko Fuhriman, and Tamarack North,

**Memorandum Decision and Order - 1**

Inc. (TNI) for approximately 101 acres of land in Valley County, Idaho. Monson, the only listed buyer in the PSA, had planned to purchase the land and then either immediately re-sell the property or develop the property in conjunction with Lori McDonald, Jesse Winn, and Jesse's father, Kerry Winn. The Fuhrimans agreed to convey the property to Monson for $5.6 million provided that Monson pay $100,000 as an earnest money deposit, which was to be held in escrow by Amerititle, Inc. (*See* Winn Aff., Ex. A (PSA, Counter Offer #2).) The PSA also provided that the $100,000 earnest money was non-refundable consideration and would be applied to the down payment on the property. (*Id.*) The PSA instructed Amerititle to release the earnest money to the sellers within three days of the buyer's inspection of the property.

Monson entered into this agreement with the Fuhrimans and TNI on December 7, 2005. The agreement stipulated that the due date for Monson to deposit the earnest money was December 26, 2005, and that the final due date for closing on the property would be January 23, 2006.

By mid-December, Monson, McDonald, and the two Winns lost their potential financier for the project. So with the due date nearing for the earnest money deposit, Kerry Winn decided to provide the $100,000 necessary to satisfy the conditions of the PSA. Winn then contacted Amerititle and asked for information about how to wire the money to the escrow account. Amerititle responded with information that included the number for the escrow account, the name of the buyer, Royce Monson, and two of the three sellers' names, TNI and Yoriko Fuhriman, but it inexplicably omitted Dee

**Memorandum Decision and Order - 2**

Fuhriman's name. Satisfied with the instructions, Winn wired $100,000 to Amerititle on December 23, 2005.

On the same day of the wired transaction, the Fuhrimans agreed that Dee would instruct Amerititle to release the earnest money to a bank account in TNI's name. TNI was entirely owned and managed by Dee Fuhriman, and both Dee and Yoriko Fuhriman had access to the bank account with the earnest money. (Declaration of Yoriko Fuhriman ¶¶ 4-6) On December 27, Amerititle complied with the Fuhriman's instructions and transferred the entire $100,000 to the TNI bank account.

Problems with the real estate transaction followed the transfer of the earnest money. Monson, McDonald, Jesse Winn, and Kerry Winn found difficulties financing the project. And ultimately, closing did not occur before January 23.

On the same day the PSA was supposed to close but did not, Monson, as the only listed buyer in the PSA, assigned his rights under the PSA to McDonald, PC, which was owned and managed by Lori McDonald. Later that same day, McDonald assigned all of her interests under the PSA to Kerry Winn; however, until recently there was no documentation of the latter assignment. Four years later, and after the filing of the current lawsuit, Monson, McDonald, and Winn all signed another document (March 2010 assignment) regarding the previous assignments of rights under the PSA. (Winn Aff., Ex. A at 1-2.) The March 2010 assignment stipulated that the assignors in 2006 intended to assign any and all claims he or she might have against Amerititle to Winn. (*Id.*)

Winn maintained hope that the Fuhrimans would eventually renegotiate and close

**Memorandum Decision and Order - 3**

the deal after he received the assignment of interests and rights under the PSA. Under the assumption that the Fuhriman's and TNI would either renegotiate the deal or return the earnest money if another buyer were to close on the property, Winn waited patiently.

Winn's patience ended by January 2009, and he filed suit in an Idaho state court against the Fuhrimans. Under a theory of unjust enrichment, Winn claimed a breach of contract and sought to recover the $100,000. During the discovery of that case, Winn learned that Amerititle paid the entire earnest money deposit to TNI. Winn promptly amended his suit to include TNI as a defendant, and on October 30, 2009, an Idaho state court issued a default judgment jointly against both Fuhrimans and TNI for restitution in the sum of $100,000.

Winn recorded the judgment in Canyon County and Valley County, but his effort to recover from the Fuhrimans or TNI was futile. Still without the $100,000, Winn filed this suit against Amerititle. Winn claims that Amerititle breached the escrow agreement, breached its fiduciary duties as an escrow agent, and acted negligently by dispersing the earnest money solely to TNI, rather than jointly to Yoriko Fuhriman and TNI. Both parties move for summary judgment on all causes of action.

## STANDARD OF LAW

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going

**Memorandum Decision and Order - 4**

to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir.2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern*

**Memorandum Decision and Order - 5**

*California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

There is, however, an exception to this rule when cross-motions for summary judgment are filed. In that case, the Court must independently search the record for issue of fact. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross-motions for summary judgment – where both parties essentially assert that there are no issues of material fact – does not vitiate the court's responsibility to determine whether disputed issues of material fact are present. *Id.* Accordingly, since the Court already has a duty to scour the record to resolve cross-motions for summary judgment, the *Carmen* line of cases discussed above does not apply to cross-motions.

**ANALYSIS**

**1.      Standing**

As a preliminary matter, the Court must consider whether Winn has standing to bring suit against Amerititle.[1] In this case Amerititle argues that Monson's assignment to McDonald, and McDonald's later assignment to Winn failed to transfer standing to Winn for two reasons. First, Amerititle argues that both of the assignments are invalid because they did not receive the consent from all of the sellers as required by the PSA. Second, Amerititle argues that even if valid, the assignments do not transfer standing because they

---

[1] Winn argues that he had standing to file suit based on the actions of Amerititle toward Winn, which resulted in the creation of a unilateral contract. (*See* Winn's Motion for Summary Judgment, Dkt. 11 at 6-7.) The court did not address this issue based on the valid transfer of standing to Winn through the March 2010 assignment.

**Memorandum Decision and Order - 6**

were not completed until after Winn filed this suit.

   A.   *Validity of the Assignment*

Ameritilte first argues that the non-assignment clause in the PSA invalidates Monson's assignment of rights to McDonald and Winn. Non-assignment clauses conditioned on the consent of the seller in a bilateral contract are generally enforceable, but are subject to a reasonableness and good faith analysis. *Cheney v. Jemmet*, 107 Idaho 829, 832, 693 P.2d 1031 (1984) ("[T]he interpretation of a non-assignment clause conditioned on the consent of the seller . . . necessarily implies that the seller will act reasonably and in good faith in exercising his right of approval.").

Considerations of an assignee's credit, reputation, or relationship with the seller will increase the reasonableness of a refusal to consent to an assignment. *See id*. However, a seller's arbitrary refusal to consent to an assignment will likely increase the unreasonable nature and bad faith of the refusal. *See id.* Furthermore, a seller can waive her right to consent to an assignment by "'manifest[ing] an intent not to require an obligee to strictly comply with a contractual duty.'" *Lewiston Pre-Mix Concrete, Inc. v. Rohde*, 110 Idaho 640, 644, 718 P.2d 551 (Ct. App. 1985) (citations omitted).

Ameritilte argues that the language in the PSA, "[a]t seller option he may agree to let contract be assumed," required Monson to obtain the consent of all of the listed sellers before he assigned his interests in the contract. (*See* Winn Aff., Ex. A (PSA, Counter Offer #2).) And because Monson's assignment to McDonald only included Dee Fuhriman's signature and not Yoriko Fuhriman's signature, that assignment was never

**Memorandum Decision and Order - 7**

valid. (Winn Aff., Ex. A (PSA, Addendum #5).) Finally, Amerititle argues that since Monson's first assignment was invalid, McDonald never had rights under the PSA and could not have assigned any rights to Winn.

Amerititle's argument fails for several reasons. First, Dee Fuhriman originally signed the first documented assignment in January 2006. (*See id.*) The sellers never denied this assignment nor requested Monson to attain Yoriko Fuhriman's consent to the assignment. This suggests a manifested intent on the part of the sellers to allow the buyers to assign their rights to the contract without strictly complying with the contractual provision. *See Lewiston Pre-Mix Concrete, Inc.*, 110 Idaho at 644. And second, the sellers have yet to actually express any intent to withhold consent to the assignments. Withholding consent to the assignments at this stage would seem largely in response to the pending litigation. This type of withheld consent would then lend itself to a bad faith analysis. *See Cheney*, 107 Idaho at 832. For these reasons, all of the assignments of rights under the PSA among the buyers are valid and enforceable.

### B.     *Assignments' Transfer of Standing*

Amerititle next argues that, with or without consent from the sellers, the March 2010 assignment that passed the rights to a cause of action under the PSA to Winn does not provide standing because that assignment happened after Winn filed this suit. Proper standing requires that an action be prosecuted in the name of the real party in interest. Fed. R. Civ. P. 17(a)(1). The basic purpose of this rule is to protect the defendant from further unnecessary litigation. *Dubuque Stone Products Co. v. Fred L. Gray Co.*, 356

**Memorandum Decision and Order - 8**

F.2d 718, 723 (8th Cir. 1966). The rule also attempts to unshackle the practice of law in the courts from the straight jacket of technical rules of pleading and procedure. *Kilbourn v. Western Sur. Co.*, 187 F.2d 567, 571 (10th Cir. 1951). Further, the rule intends to provide a more speedy and complete adjudication of a controversy between all interested parties without regard to technicalities and mere formal technical rules. *Id*.

Modern interpretations of Rule 17(a) allow a real party in interest the ability to assign her rights in an action to a third party. *See Federal Deposit Ins. Corp. v. Main Hurdman*, 655 F.Supp. 259, 267 (E.D. Cal. 1987). The assignment can give the assignee proper standing as the real party in interest "even when the claim is not assigned until after the action has been instituted." *Id*. (internal citations omitted); *see also* 6 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1545 (2010).

In this case, the Court must analyze several important considerations in determining whether the March 2010 assignment transferred standing to Winn. First, the Court must determine what Winn acquired in the March 2010 assignment. *See Dubuque Stone Products*, 356 F.2d 723-24. That assignment stated that the "[a]ssignor hereby assigns . . . all of [a]ssignor's rights and benefits and duties and obligations in, to, and under the PSA and the escrow established with respect thereto, including all of [a]ssignor's rights arising under or related to the Earnest Money and any and all claims thereto . . . ." (Winn Aff., Ex. A (March 2010 assignment).) This language explicitly transfers a cause of action to Winn, and thus any claims against Amerititle that either

**Memorandum Decision and Order - 9**

Monson or McDonald had were clearly transferred to Winn.

Second, the Court must look to whether Winn had any interest in the cause of action at the time he filed suit and before he received the assignment. *See Campus Sweater and Sportswear Co.v. M.B. Kahn*, 515 F.Supp. 64, 84 (D.S.C. 1979) (although the plaintiff did not technically have standing before he brought suit, the plaintiff's interest in the cause of action before the assignment satisfied one of the factors necessary to validate the transfer of standing). Amerititle argues that the court should apply the ruling in *Riverfront Landing Phase II Owners' Ass'n v. Assurance Co. of America*, which held that a plaintiff did not have standing to file suit because it could not separately establish standing at the time of the filing of the suit. 2009 WL 1952002, at *4 (W.D. Wash. July 6, 2009). A later assignment, after the filing of the suit, could not cure the deficiency of the plaintiff's standing because the plaintiff had no interest in the cause of action at the time of filing. *Id*.

In contrast, Winn's interest in this case is different. Although he may not technically have had standing at the time he filed suit, Winn had a strong $100,000 monetary interest in the cause of action. And similar to the plaintiff's interests at the time of the filing in *Campus Sweater*, Winn's involvement in the transaction with Amerititle provided him with considerable interest in the action even before the March 2010 assignment. *See Campus Sweater*, 515 F.Supp. at 84-85 (finding post-filing assignment was valid where assignor was mere "straw man" and assignee was party with actual interest in the transaction at issue).

**Memorandum Decision and Order - 10**

Third, the Court must determine whether the assignment of standing will prejudice Amerititle in preparing a defense against the cause of action. *See Dubuque Stone Products*, 356 F.2d at 724. This analysis looks at the timing of the assignment in relation to a looming trial date to determine whether Amerititle will be prejudiced. *See id*. The March 2010 assignment transferred rights under the PSA to Winn only two months after he filed this suit. With a trial date still to be determined, Amerititle has plenty of time to prepare any and all defenses it has against this complaint. Furthermore, this assignment has not caused Amerititle to lose any of its potential defenses that it may have had against either Monson or McDonald if either of those two had decided to bring suit.

Finally, the Court must decide if the March 2010 assignment will uphold the purpose of Rule 17(a)(1), which is to ensure that the defendant litigates this action only once. *See U-Haul Intern., Inc. v. Jartran, Inc.,* 793 F.2d 1034, 1039 (9th Cir. 1986). According to Winn, the purpose of the March 2010 Assignment was to ensure that neither Monson nor McDonald would join, or be joined, as a party in this suit. (Pl's Opp'n, Dkt. 20 at 5.) Further, the assignment itself specifically transferred any and all rights in this cause of action to Winn, which would preclude both Monson and McDonald from joining in the action or bringing a future action for the same claim.

Ultimately, the March 2010 assignment efficiently consolidated this action between the two parties of interest without prejudicing Amerititle, and therefore, effectively transferred standing to Winn.

**Memorandum Decision and Order - 11**

## 2. Ameritite's Duty Under the Escrow Agreement

Winn complains that Ameritite breached its duty under the escrow agreement by failing to adhere to the escrow instructions, which Winn claims required Ameritite to release the escrow deposit jointly to Yoriko Fuhriman and TNI. (Pl's Brief, Dkt. 11 at 14-17.)

### A. *The Escrow Duty*

Escrow depositaries are held to the strict compliance of the instructions of the escrow agreement. *Blaine County Title Associates v. One Hundred Building Corp., Inc.*, 138 Idaho 517, 520, 66 P.3d 221 (2002). Any action with reference to the handling of the deposit which is not authorized in the instructions will leave the depositary liable. *Id.* But in order to be held liable, the depositary must know the terms of the agreement so that it can understand its duties. *Foreman v. Todd*, 83 Idaho 482, 486, 364 P.2d 365 (1961). And although a depositary will act as an agent or trustee to both parties in a transaction, "[the depositary] is empowered to aid neither, being merely the conduit used in the transaction for convenience and safety." *Id.* (citations omitted).

The liability of the escrow depositary largely depends on its specific or express duties in the escrow agreement. *See e.g.*, *Blaine County Title Associates*, 138 Idaho at 520-21 (the escrow depositary failed to adhere to specific escrow instructions regarding the release of the escrow money and was held liable); *All American Realty, Inc. v. Sweet*, 107 Idaho 229, 230, 687 P.2d 1356 (1984) (escrow agent violated the "express instructions" of the escrow agreement and was held liable).

**Memorandum Decision and Order - 12**

Winn points to multiple documents in the record other than the PSA to argue that the escrow instructions required Amerititle to release the earnest money to both Yoriko Fuhriman and TNI. (*See e.g.*, Burns Aff., Ex. C (Order Sheet and Master Billing Sheet); Burns Aff., Ex. F (Closing Sheet).) Although these documents list both TNI and Yoriko Fuhriman as the seller in the transaction, none of them instruct Amerititle how to release the earnest money. And without any specificity in the escrow instructions, Amerititle cannot be held in breach of unclear duties that it did not know it had. *See Foreman*, 83 Idaho at 486.

Further, many of the documents include the names of the sellers for reference purposes only. Winn argues that the wiring instructions that Amerititle provided him before he transferred the $100,000 earnest money named the sellers in the transaction as though to instruct Amerititle about how to release the earnest money. However, right above the number of the escrow account, the name of the buyer in the transaction (Monson), and the names of the sellers (TNI and Yoriko Fuhriman), are the words, "AND PLEASE REFERENCE THE FOLLOWING." (*See* Winn Aff., Ex. C (Wiring Instructions).) The inclusion of the sellers' names throughout these documents are not meant to instruct Amerititle as to the release of the earnest money, but rather to inform all of the parties about the nature of the transaction.

The names of the sellers appearing throughout these documents also provide information about the wiring instructions for the earnest money, but do not provide escrow instructions regarding how to release the earnest money. These wiring

**Memorandum Decision and Order - 13**

instructions merely inform the parties about how to transfer the earnest money to the proper accounts. The language, "For Tamarack [sic] North Inc and Yoriko Fuhriman" does not provide any information about whether Amerititle should release the earnest money equally to both sellers, or whether Amerititle should somehow divide the earnest money between the sellers, or even whether Amerititle should release the earnest money to only one of the sellers.

Winn claims that Amerititle had a duty to release the $100,000 escrow deposit to every listed seller, but the escrow agreement within the PSA never specifically explained how Amerititle was supposed to release the money. The lack of an explicit escrow instruction for Amerititle to release the funds to every seller fails to create the duty that Winn claims that Amerititle breached.

### B. *Breach of Duty*

Although the escrow instructions in the PSA were generally vague, Amerititle still had a duty to follow them as closely as possible. The PSA instructed Amerititle that the "$100,000 [earnest money was] to be released to seller as non-refundable consideration and applied to down payment 3 days after physical inspection of property." (*See* Winn. Aff., Ex. A at 11 (counter offer #2).) A note on the closing sheet instructed Amerititle in largely the same fashion, "E $ to be released to seller 3 days after inspection of property." (*See* Walters Aff., Ex. H (closing sheet).)

With this information, Amerititle received instructions from Dee Fuhriman (who for whatever reason was not included on many of the wiring instructions that Winn cites,

**Memorandum Decision and Order - 14**

but was included on the PSA) to transfer the earnest money to a bank account to which all of the sellers had access. (Declaration of Yoriko Fuhriman ¶ 6.) Three days after Winn transferred Amerititle the earnest money, Amerititle released the funds to the sellers' requested bank account. Amerititle, therefore, adhered to the express duties in the PSA because it released the escrow money to the sellers, or at least to the bank account that all of the sellers designated as appropriate, three days after Winn, or Monson as the original buyer, had the opportunity to physically inspect the property.

C.     *Resulting Harm[2]*

Winn argues that, despite the unclear language in the PSA, had Amerititle followed the escrow instructions in the PSA, the closing sheet, and the several letters of correspondence between himself and Amerititle, then Yoriko Fuhriman would have received some portion of the escrow money. But since Yoriko did not receive any of the escrow money she is now unable to pay any of the judgment against her that is pending from the decision in the Idaho state court. Therefore, Winn claims that Amerititle's breach in failing to deliver the escrow money jointly to all the sellers has caused him damage in his attempt to recover on the state court's judgment.

---

[2] Winn objects to the Court's ruling on damages in connection with the decision on Amerititle's summary judgment motion based on the Court's Case Management Order. (Pl's Response, Dkt. 27; *see also* Case Management Order, Dkt. 8.) Winn, however, states in his Statement of Issues for Early Discovery and Resolution that "Winn will likely assert the issue of the defendant's liability..., *together with the issues of damages, as there is no dispute over the amount of Winn's earnest money deposit . . .*" (Dkt. 9 at 1) (emphasis added). Just as notably, Winn responded to Amerititle's summary judgment argument that Winn incurred no damages as a result of Amerititle's release of the earnest money to TNI solely. (Pl's Opp., Dkt. 20, at 5.) Winn, therefore, cannot now complain that the Court has unfairly raised the damages issue.

**Memorandum Decision and Order - 15**

However, even if a jury were to decide that Amerititle had a duty to Winn to distribute the escrow money jointly to all the sellers, and Amerititle breached that duty, Winn cannot show that he is harmed by the breach.

First, the record indicates that Yoriko Fuhriman intended for the escrow money to stay in TNI's bank account, "Dee and I (Yoriko) agreed that he would instruct Amerititle regarding how the earnest money was to be deposited. It was our intent and plan that Amerititle deposit the entire earnest money amount into [the TNI account]." (Yoriko Fuhriman Declaration ¶¶ 4-6.) Furthermore, in a sworn declaration, Yoriko claimed that she "along with [her] husband . . . had access to the earnest money in the Account." (*Id.* at ¶ 6.) The record indicates that had Amerititle distributed a portion of the escrow money to Yoriko, the money would still have ended up in the same place because that was the sellers' intention throughout the transaction.

To rebut Yorkio's declarations, Winn must direct the court's attention to specific triable facts. *See Southern Gas Co.*, 336 F.3d at 889. Winn points to Dee Fuhriman's pro se answer in Winn's state court lawsuit to claim that Yoriko never received any of the escrow money, and that Yoriko's current judgment-proof status may be different now had she received her portion of the money. (Pl's Response, Dkt. 20 at 5-6.)

Yet while Dee had a right to answer for himself in that action, he had no right to represent Yoriko. *See Citibank (South Dakota), N.A. v. Carroll*, 148 Idaho 254, 220 P.3d 1073, 1079 (2009). That answer, therefore, cannot be attributed to Yoriko. Furthermore, Dee did not submit that answer under oath. (Winn Aff., Dkt. 11 at. Ex. F.) Finally, even

**Memorandum Decision and Order - 16**

if the court did consider Dee's answer as being attributable to Yoriko, the answer does not directly contradict the argument that Yoriko would have done anything differently with the money had Amerititle distributed it to her as well as TNI. The elusive language of Dee's answer merely states that "[Dee and Yoriko] did not receive the money. There are no documents that suggest they received the money." (*Id.*) This language may carry different connotations, but on its face it simply suggests that neither Dee nor Yoriko received the money. It does not establish that Yoriko would have deposited the money in her personal account rather than the TNI account. Nor does this language suggest that Dee and Yoriko would still have the money today to satisfy the state court judgment had it been released jointly to Yoriko as Winn claims it should have been.

Therefore, had Amerititle delivered the escrow money to all three sellers jointly, there is nothing in the record to indicate that the money would have ended up in some account other than the TNI account. *See* Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in is own pleadings; rather, its response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial.").[3] Winn has not shown any evidence that Yoriko would have had any of the escrow money four years later.

---

[3] At the motion hearing, Winn's counsel claimed that he could not track down either of the Fuhrimans to depose them on this issue. Yet Winn did not provide anything in the record to show that the Fuhrimans' were unavailable. Winn, therefore, cannot use Fed. R. Civ. P. 56(f) to argue that the court can deny this motion based on the unavailability of the Fuhrimans' deposition testimony.

**Memorandum Decision and Order - 17**

Second, Winn's claim requires the finder of fact to engage in sheer speculation and conjecture. *See Todd v. Sullivan Construction, LLC*, 146 Idaho 118, 122 (2008) ("Damage awards based upon speculation and conjecture will not be allowed." (omitted citations)). In this case, Winn must be able to prove that (1) Yoriko would have kept the escrow money, rather than deposit it in TNI's bank account, and (2) Yoriko would still have some of the money today to be able to pay on the judgment in the Idaho state court. However, there is nothing in the record to indicate that Yoriko would have done something different with the money other than deposit in the TNI account or that her doing something different with the money would have resulted in her still retaining the money today.

### 3. Conclusion

Ultimately, Winn's contract and tort claims against Amerititle fail for several reasons. First, Winn cannot show that the escrow instructions clearly entailed a duty for Amerititle to distribute the escrow money jointly to every seller. Second, even if a jury could conclude that Amerititle did have a duty to distribute the escrow money jointly, Winn cannot show that the Amerititle breached its duty and caused harm to Winn. The record indicates that Yoriko Fuhriman intended for the escrow money to go to exactly where it went. Therefore, four years later, Winn is in the same position as he would have been had Amerititle released the money jointly.

# ORDER

**IT IS THEREFORE ORDERED that:**

1. Plaintiff's Motion for Summary Judgment (Dkt. 11) is DENIED.

2. Defendant's Motion for Summary Judgment (Dkt. 14) is GRANTED.

3. Plaintiff's Motion to Strike (Dkt. 19) is DENIED as moot.

DATED: **August 10, 2010**

Honorable B. Lynn Winmill
Chief U. S. District Judge